# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
August 24, 2012 Session

## IN RE ADRYAN L. B. AND BRENDEN A. B.[1]

**Appeal from the Juvenile Court for Davidson County**
**No. 100803, 141901      Betty K. Adams Green, Judge**

---

**No. M2012-00916-COA-R3-PT - Filed October 24, 2012**

---

Mother appeals the termination of her parental rights to two children.  Mother's rights were terminated on grounds of abandonment by failure to support the children within four months prior to her incarceration and wanton disregard for the children's welfare, substantial noncompliance with permanency plans, and persistence of conditions.  Finding no error, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Nick Perenich, Nashville, Tennessee, for the Appellant, Candace C.

Robert E. Cooper, Jr., Attorney General and Reporter; Shanta J. Murray, Assistant Attorney General, for the Appellee, Tennessee Department of Children's Services.

Laura Stewart, Nashville, Tennessee, Guardian Ad Litem.

## OPINION

This is a termination of parental rights case involving two minor children, Brenden A. B. (D.O.B. 9/26/2000) and Adryan L. B. (D.O.B. 9/17/2001) (collectively, "the children").

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

Candice C. ("Mother") and Brendan B., who never married, are the biological parents of both children.[2]  Only Mother appeals the termination of her parental rights.

## I.  Factual and Procedural Background

This proceeding arises out of a dependency and neglect petition filed by the children's guardian ad litem[3] on December 22, 2008, naming Mother as the respondent, which alleged that the children were "in a condition of want or suffering."  By agreed order, the court granted the petition on May 20, 2009 and placed the children in the custody of the Department of Children's Services ("DCS").  The children have not returned to Mother's custody since that time and have resided in a pre-adoptive foster home since April 2010.

Following the children's removal, Mother and DCS developed the first of three permanency plans on June 23, 2009.[4]  Due to Mother's lack of progress in obtaining stable housing and employment, DCS developed a second permanency plan on February 8, 2010.[5]  On February 8, 2011, Mother and DCS developed the third and final permanency plan.

In March 2011, Mother obtained a two bedroom apartment.  That same month Mother was arrested after an argument with the father of her youngest child escalated into a physical altercation; Mother was the only party arrested.  Because Mother was on probation as a result of a felony conviction, the arrest caused her to be incarcerated for a three-week period while she awaited a hearing on the possible revocation of her probation.

On April 29, 2011, DCS initiated a proceeding to terminate Mother and Father's parental rights, alleging abandonment by an incarcerated parent by failure to support and wanton disregard for the welfare of the children, substantial noncompliance with the permanency plan, and persistence of conditions.  On March 30, 2012, the court entered an

---

[2] Mother has two other children, Xavian and Julius, who are not subjects of this proceeding,

[3] In 2006, Laura Stewart was appointed guardian as litem for Brenden and Adryan in a dependency and neglect proceeding filed by the children's stepmother, Victoria B., following Mother's indictment and arrest for cocaine distribution charges and resulting incarceration.  Ms. Stewart has served as the children's guardian ad litem since that time.

[4] The June 23, 2009 permanency plan in the appellate record only refers to Brenden A. B.; the plan for Adryan L. B. was not included in the record due being damaged in the May 2010 Nashville flood.

[5] The February 8, 2010 permanency plan in the appellate record only refers to Adryan L. B.; the plan for Brenden A. B. was also damaged in the flood.

order making extensive findings of fact; the court held that it was in the best interests of the children that the parental rights of Mother and Father be terminated on the grounds alleged.

Mother appeals the order terminating her rights, raising the following issues:[6]

I.      Whether the Department of Children's Services made reasonable efforts to reunify the children with their mother?

II.     Whether abandonment as defined by Tenn. Code. Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv) may be used as a ground to terminate parental rights in this case?

III.    Whether the evidence was sufficient to support the judgment of the trial court?[7]

## II. Standard of Review

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174–75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A party seeking to terminate the parental rights of a biological parent must prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Secondly, the party must prove that termination of the parental rights of the biological parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

---

[6] In the argument section of her brief, Mother contests the sufficiency of the evidence with respect to each ground for termination and with respect to the best interest analysis. In order to deal with each ground only once, this opinion is organized around the grounds that serve as a basis for the termination of Mother's parental rights. We address each issue raised by Mother under the relevant subheading.

[7] Mother contends that the court's incorporation of five factual findings from a prior custody order into the order terminating her parental rights was improper because the incorporated findings were made by a preponderance of the evidence, rather than by clear and convincing evidence. The findings to which Mother refers provide background information relative to the environment in which the children were being raised from September 2004 through May 2009 and are supported by testimony given in the termination case.

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 766–69; *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); *In re Valentine*, 79 S.W.3d at 546. In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

### III. Discussion

### A.    Abandonment as a Grounds for Termination

As a preliminary matter, we address Mother's contention that abandonment may not be used as a grounds for termination because DCS failed to properly notify her of the risks of becoming incarcerated while the children were in DCS custody and because there is no evidence that the court reviewed the definition of abandonment with her in court.

Tenn. Code Ann. § 37-2-403 requires the State to provide parents with two types of notice regarding the definition and potential consequences of "abandonment" as that term is defined in Tenn. Code Ann. § 36-1-102. Parents must be provided notice in the permanency plan itself and in court when the permanency plan is ratified. *See* Tenn. Code Ann. § 37-2-403(a)(2). Without proof in the record of compliance with the notice provisions of Tenn. Code Ann. § 37-2-403, the appellate court must set aside a trial court's finding of abandonment. *In re D.D.K.*, No. M2003-01016-COA-R3-PT, 2003 WL 23093929, at *7 (Tenn. Ct. App. Dec. 30, 2003).

The record shows that permanency plans were prepared by DCS in consultation with Mother on June 23, 2009, February 8, 2010, and February 8, 2011. The June 2009 plan was reviewed by the court at a hearing on July 10, 2009, the February 2010 plan was reviewed at a hearing on April 20, 2010, and the February 2011 plan was reviewed on March 1, 2011; each plan was ratified by the court. All three plans recorded that Mother was present at the hearing and that, in the course of the hearing, the grounds for termination and the statutory definition of abandonment were reviewed with her.

The record also shows that Mother signed DCS forms entitled "Criteria and Procedures for Termination of Parental Rights" (the "Criteria") at the time that she signed the February 2010 and February 2011 plans. Mother's signature on the forms acknowledged that she received the Criteria and was given an explanation of its contents. Pertinent to this issue, the Criteria stated the following:

> Tennessee law currently lists the following as grounds for termination of parental rights:
>
> ABANDONMENT
> An incarcerated parent has willfully failed to visit, to engage in more than 'token' visitation, or to make reasonable child support payments for (4) consecutive months immediately <u>before</u> being incarcerated, or
> . . .
> WANTON DISREGARD
> A parent who is now incarcerated "engaged in conduct prior to incarceration which exhibits **wanton disregard** for the welfare of the child."

The language used in the Criteria corresponds to the statutory definitions of abandonment and is sufficient to comply with Tenn. Code Ann. § 37-2-403. Tenn. Code Ann. § 36-1-102(1)(A)(iv) provides that "abandonment" may be found when a parent is incarcerated at the time the termination proceeding is initiated if the parent has failed to pay child support or visit the child in the four months immediately prior to his or her incarceration or when "the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Although the language used in the Criteria simplified the statutory language, the content was sufficient to give Mother notice.

Mother contends that the fact that the court did not check a box on the order approving the February 2011 plan, whereby the court was to affirm its compliance with Tenn. Code Ann. § 37-2-403(a)(2)(B)(i), is evidence that she was not properly notified. While the Permanency Hearing Order does not have the particular box marked, we do not find this to be sufficient evidence that Mother did not receive the notice required by the statute. It does not outweigh the proof that on numerous occasions Mother was advised of the definitions of abandonment.

We agree with the trial court's holding that the notice that Mother received was adequate and complied with Tenn. Code Ann. § 37-2-403.

**1.       Abandonment by Failure to Support**

Mother contends that the evidence does not prove that Mother wilfully failed to pay child support. Mother asserts that she "believed she was paying support through withholding from her paycheck on Xavian and at least one of the children in DCS custody."[8] Mother also asserts that she lacked the capacity to pay child support due to the other requirements of the permanency plan, and that she brought gifts and food to the children at visitation.

In order for a court to find abandonment by failure to support, it must determine that the parent's failure was "willful." *See In Re Swanson,* 2 S.W.3d 180, 184–85 (Tenn. 1999). Failure to pay support is "willful" if the parent "is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." *In Re J.J.C.*, 148 S.W.3d 919, 926 (Tenn. Ct. App. 2004). As noted above, Tenn. Code Ann. § 36-1-102(1)(A)(iv) looks at the four months immediately preceding a parent's incarceration as the relevant time frame for determining whether the parent has willfully failed to support. The record shows that Mother was arrested and incarcerated in March 2011; accordingly, the relevant four month period runs from November 2010 until March 2011.

Mother does not assert that she was unaware of her duty to support the children. Mother testified that she "supported [the children] the best she could" and that, while she signed the Criteria which notified her of her duty to support, she believed the Criteria referred only to court ordered support. The fact that a parent may not be under an order to pay support, however, is not dispositive of the question of whether the failure is willful, as the obligation to pay support exists in the absence of a specific order. *Tenn. Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 524 (Tenn. Ct. App. 2004). We find that Mother was aware of her duty to support the children irrespective of whether she was under an order to pay such support.

Mother asserts that she was unable to pay support given the other financial obligations imposed by the permanency plan. Mother testified that she was employed as a waitress and trainer at IHOP for the four month period preceding her incarceration and made between $300 and $500 per week. Further, Mother testified that she had made no payments toward her outstanding fines or debts as required by the permanency plan.[9] DCS and Mother

---

[8] Xavian's father filed an action for child support against Mother which led to the garnishment of Mother's check.

[9] The permanency plan required that Mother pay outstanding debts and court fines. These fines resulted from Mother's 2009 conviction for driving under the influence. Mother incurred additional fines

(continued...)

developed each of the plans and Mother attended each ratification hearing; the record does not show that Mother raised any concerns regarding her ability to meet the financial obligations in the permanency plans with DCS or the court prior to ratification. We agree with the court's finding that Mother failed to pay child support "despite having money to pay for bail and despite testifying that she continually was employed." Her assertion of hardship is not a justifiable excuse for nonpayment of child support.

Mother also asserts that her failure to pay child support was not willful because she believed that child support was garnished from her wages on behalf of Adryan and Brenden; we are not persuaded by Mother's assertion. Mother testified that her wages were garnished for child support on behalf of Xavian beginning in 2008; in light of the fact that this was before Adryan and Brenden entered DCS custody, Mother's assertion lacks believability. In making this determination, we give great deference to the trial court's assessment that Mother was not a credible witness and that her testimony that she was unsure as to whether the payments were for the children in this case or for Xavian should be given little weight.

Mother contends that she supported the children because that she brought gifts and food to the children at visitation. Mother testified that she brought the children clothes and gifts, provided meals at visitation, and sent money home with the children for their needs. Marissa Policicchio, the children's foster care case manager, testified that Mother paid for the children's entertainment at visitations and sent the children home with money for a meal at McDonald's on one occasion. Additionally, Ms. Policicchio testified that many of the gifts and financial support came not from Mother, but from another relative. According to Tenn. Code Ann. § 36-1-102, support for a child is "token" if, under the circumstances of the individual case, the support is insignificant given the parent's means. Based on the record, Mother's occasional gifts and meals were token support.

Mother's abandonment of the children by failure to support is supported by clear and convincing evidence.

### 2.    Abandonment by Wanton Disregard

Mother contends that the court erred in holding that she abandoned her children by showing a wanton disregard for their welfare.

---

(...continued)

following the filing of the termination petition at issue here for her conviction for driving on a suspended license, legend drug possession without a prescription, and altered tags.

As noted previously, Tenn. Code Ann. § 36-1-102(1)(A)(iv) provides, in relevant part, that a parent who "has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding" may have her parental rights terminated on the basis of abandonment if the parent "has engaged in conduct prior to incarceration that exhibits wanton disregard for the welfare of the child." Incarceration alone does not serve as a basis for the termination of parental rights, but merely serves as a trigger to allow the court to evaluate a child's situation more closely to determine whether the conduct leading to the parent's incarceration is part of a "broader pattern of conduct" rendering the parent unfit. *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005).

Mother asserts that abandonment by an incarcerated parent should not be available as a grounds for termination because she was not convicted of the offense which led to her incarceration. In construing Tenn. Code Ann. § 36-1-102(1)(A)(iv), we must apply the most basic principle of statutory construction which is to ascertain and give effect to legislative intent without broadening the statute beyond its intended scope. *See State v. Sherman,* 266 S.W.3d 395, 401 (Tenn. 2008). When statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use. *Overstreet v. TRW Commercial Steering Div.,* 256 S.W.3d 626, 630 (Tenn. 2008). Tenn. Code Ann. § 36-1-102(1)(A)(iv) requires only that a parent be incarcerated in order to trigger its provisions, and, as the statute is unambiguous, we apply its plain meaning. The record shows that Mother was arrested and incarcerated in March 2011, one month prior to the filing of the petition. Accordingly, abandonment as defined in Tenn. Code Ann. § 36-1-102(1)(A)(iv) may serve as a basis for the termination of her parental rights.

To support its holding that Mother abandoned the children through a wanton disregard for their welfare, the court stated:

> [Mother] has shown a wanton disregard for the welfare of her children in that she has been found guilty of probation violation, she is currently on probation for cocaine charges, she had two significant periods of time where she did not know where her children were, she willfully placed her children with a madam exposing them to criminal behavior, she has worked as a prostitute, and the fact that she continually farmed out her children for others to raise.

The trial court found that Mother "permitted her children to be raised by others, and there has been no evidence that [Mother] recognizes her choices or how her choices have affected her children." The court's holding that Mother's conduct exhibited a wanton disregard the welfare of her children for a number of years is supported by clear and convincing evidence, particularly the testimony of Mother, summarized below.

The children had their first contact with DCS in 2002 when they were removed from Mother's custody after being found alone in a vehicle parked outside a shopping mall while Mother was inside the mall; Mother regained custody of the children after two months.

Beginning in October 2004, Mother worked for an escort service run by Victoria B., a woman Mother characterized as her "madam" and who married the children's father, Brendan B., in 2005. Despite the fact that Mother knew that Victoria B. took escort calls in front of the children, she left the children with Victoria B. and Victoria B.'s mother while Mother worked; Victoria B. would often not return the children to Mother for long periods of time. Mother testified that she stopped working for Victoria B. in January 2005, and moved in with Alvin D., a man she knew to be involved in the sale of drugs; the children lived down the street with a relative. Mother was arrested for two counts of possession with intent to sell cocaine in August 2005; she testified that, after her release from a two-day incarceration, she could not locate the children until October 2005 because Victoria B. had "kidnapped" them. At that time, Mother, Alvin D., and the children moved into a home with Alvin D.'s parents.

Mother began to work as an escort for Victoria B. a second time in June 2006, following her indictment on the 2005 cocaine trafficking charge; Victoria B., Mother, and the children lived together in Victoria B.'s home during that time. On July 24, Victoria B. filed a petition seeking temporary custody of the children, alleging that Mother "is gone to prison" and, as a result, the children and their half-sibling Xavian were dependent and neglected; Mother and Victoria B. agreed to share temporary joint custody of the children and the court delayed a hearing on the dependent and neglect petition pending resolution of Mother's pending criminal charges.

Mother testified that she stopped working for Victoria B. in February 2007 and moved into the home of another escort who also worked for Victoria B; the children remained in Victoria B.'s home. Mother was also convicted in 2007 for driving under the influence in Kentucky, and her driver's license was suspended.

In 2008, the court held the hearing on Victoria B.'s dependency and neglect petition, and in May, Mother regained custody of the children. The children were placed with a relative in December after Mother's car was repossessed and the utilities at her home disconnected.[10] Victoria B. took custody without Mother's knowledge and lived for a period of time with the children at an assisted living facility.

---

[10] Mother testified that her car was repossessed and utilities disconnected because her wages began to be garnished for child support for Xavian.

In January 2009, Mother lost her job due to non-disclosure of her felony conviction and was evicted from her home; in February, she pled guilty to driving under the influence, which was a violation of her probation.

"It is well established that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the child's welfare." *In re E.M.S.*, No. M2009-00267-COA-R3-PT, 2009 WL 2707399, at *4 (Tenn. Ct. App. Aug. 27, 2009). The pattern of conduct detailed above illustrates Mother's wanton disregard for the welfare of her children as contemplated by the statute. Mother surrounded herself and her children with criminal behavior in the form of prostitution and the drug trade. After her felony drug conviction, Mother continued to participate in criminal behavior and incur repeated probation violations. Even more significant is Mother's disregard for the needs of her children as she knowingly placed them in unstable living arrangements with inappropriate caregivers.

The record contains clear and convincing evidence that Mother abandoned her children through her wanton disregard for their welfare.

B.      **Substantial Compliance with the Permanency Plan**

DCS, with Mother's cooperation, developed three permanency plans following the children's removal from Mother's custody in 2009. The first plan established reunification with Mother as the primary goal and included the following action steps for Mother: maintain legal employment, maintain stable and appropriate housing free of domestic violence and illegal drugs, refrain from knowingly violating probation, submit to random drug screens, fully participate in a complete psychological evaluation with parenting component, participate in family counseling if needed, and maintain contact with DCS. The second plan largely remained the same as the first, but included the following additional requirements: demonstrate parenting skills, maintain residency and income for three months prior to trial home visit, and provide documentation of probation compliance to DCS. The third plan updated the goal of the plan to include adoption and required Mother to develop a written budget, communicate honestly with her landlord about her criminal history, determine and resolve outstanding debts, and reestablish a valid driver's license.

Tenn. Code Ann. § 36-1-113(g)(2) authorizes termination of parental rights for failure to comply with a parenting plan. In order for noncompliance to justify the termination of parental rights, it must be "substantial." *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008). In conjunction with terminating a parent's rights on the ground of substantial noncompliance, the trial court must find that the

requirements of the permanency plan that the parent allegedly did not satisfy are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). The issue of substantial noncompliance with the requirements of a permanency plan is a question of law; therefore, it is reviewed *de novo* with no presumption of correctness. *Id.* at 546.

As an initial matter, we address Mother's contention that the requirements that she pay her outstanding debts and reestablish her driver's license were not reasonable and related to remedying the conditions that led to the children's removal. Because the trial court made no finding regarding the reasonableness of Mother's responsibilities under the permanency plans, our review of this issue is *de novo*.

The first permanency plan noted that the children came into DCS custody, after being in the home of a relative, due to "want and suffering"; a condition which prevented their return to Mother was that she was "still in need of an appropriate residence and stable employment." The second plan noted that Mother was still in need of stable employment. The third plan noted that, as of the date of the plan, Mother was "still without a stable, appropriate residence."

The requirement that Mother address the root causes of the children's condition is both reasonable and related to achieving reunification with them. Mother's legal and financial instability were substantial factors in the conditions which led the guardian ad litem to initiate the dependent and neglect proceeding leading to the children's removal from Mother's custody, a course of action to which Mother agreed; as a result of the removal, Mother participated with DCS in the development of the plans. Mother had a long, continuing history of run-ins with the law, including driving offenses and the evidence, taken as a whole shows that, in matters big and small, Mother chose to live outside the law.[11] The debts which were outstanding were those incurred largely due to court fines imposed as a result of her driving offenses and payment of those fines was a condition of having her driving privileges restored. Likewise, retaining driving privileges would assist Mother in maintaining her employment which, in turn, would enable her to maintain stable housing. There is no doubt that each condition of the plan was designed to assist Mother in addressing her issues.

The court held that DCS met its burden in proving that Mother failed to follow the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2). The court based its holding on the evidence that Mother had been arrested multiple times in the preceding year; that she

---

[11] For instance, Ms. Policicchio testified that, following one team meeting, she saw Mother, unlicensed at the time, drive herself from the office.

admitted to driving without a license; that she made no effort to pay her court fines but instead paid $1700 for the down payment on a car; that she tested positive on one drug screen and refused "one or two" others; that she reported to DHS that she made $1000 monthly despite testifying that she made $2000 monthly; that DCS had "valid concerns with Mother's ability to demonstrate parenting skills despite receiving training for over a year"; and that the budget Mother submitted to DCS was inadequate because it was not based on true and accurate information.

Mother contends that she was in substantial compliance with the permanency plan and that clear and convincing evidence did not support a contrary finding. Upon our review of the evidence, however, Mother's failure to substantially comply with the requirements of the permanency plan is shown by clear and convincing evidence.

Mother testified that she maintained regular visitation with the children, established a residence and legal employment, and participated in all required counseling and parenting sessions. Mother conceded that she failed to make any payments toward her outstanding debts in order to reinstate her driver's license. Mother testified that she drove without license, registration, or insurance on many occasions, and that she was arrested twice for driving on a suspended license in violation of her probation following the filing of the petition.[12] It is undisputed that Mother knowingly violated her probation more than once while the children have been in DCS custody. Further, it is undisputed that Mother failed to make any payment toward her outstanding fines in order to reestablish her driver's license. The record also shows that Mother failed to provide DCS with an accurate budget or proof of probation compliance.

Mother asserts that the following specific findings of the court relative to her compliance with the permanency plan were in error and unsupported by the record:

1. [Mother] received everything she requested from DCS, except a bus pass.[13]
2. [Mother's] failure to be completely truthful with various service providers made it impossible for these service providers to help her.

_____

[12] Mother testified that she was arrested for driving on a suspended license in September 2011, and that she paid bail and did not serve time in jail. Mother testified that she was arrested again in October 2011, for driving on a suspended license, legend drug possession, and altered tags, and that she again paid bail. As a result of these arrests, Mother was arrested for a probation violation and was incarcerated at the time of trial.

[13] Mother's argument with respect to this finding will be addressed in our discussion of DCS' reasonable efforts.

3. [Mother's] inability to tell mental health providers the "whole story" cut off lines of inquiry for these mental health providers such that their ability to even assess what was needed was impacted.

These findings are supported by clear and convincing evidence in the record.

With respect to the impact of Mother's truthfulness on the provision of services, the court found that Mother did not provide complete information to the evaluator at her first psychological evaluation, that she misled her counselor into taking her to purchase a vehicle despite the fact that Mother's license was suspended, and that Mother failed to give her individual counselors the "whole story."

Ms. Policicchio testified that, while Mother participated in the required parenting classes and therapy sessions, she failed to be truthful in her interactions with counselors which impeded their ability to provide services; specifically, Mother did not reveal her history of prostitution, drug and alcohol use, or the reasons that the children entered DCS custody. She testified that Mother attempted to manipulate counselors instead of working toward improving her parenting or decision-making skills. Ms. Policicchio's testimony that Mother's lack of truthfulness and cooperation with service providers impeded their ability to assist her in making meaningful improvements to her parenting ability and life choices, minimized the impact of her participation in other classes and counseling sessions, and thwarted DCS' efforts to assist her.

The evidence, taken as a whole, supports the trial court's finding that DCS's concerns regarding Mother's parenting ability were legitimate. Mother's lack of compliance with the permanency plan was substantial.

## C.     Reasonable Efforts

Mother contends any failure by her to substantially comply with the permanency plan was due to DCS' failure to make reasonable efforts to assist her in accomplishing its action steps. We will address this issue even though we have found that the evidence clearly and convincingly shows that Mother failed to comply with the permanency plan.

Key in determining whether a parent's parental rights may be terminated on the basis of substantial noncompliance is whether DCS fulfilled its obligation to provide services reasonably necessary to assist a parent in meeting his or her obligations under the permanency plan. *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7–8 (Tenn. Ct. App. Mar. 9, 2004). DCS employees have an affirmative duty to use their education and training to help parents improve the conditions that led to the children's

removal and complete the action steps necessary for reunification.[14] *In re Giorgianna H.*, 205 S.W.3d 508, 518–19 (Tenn. Ct. App. 2006). DCS' reunification efforts need not be "herculean"; parents who wish to be reunited with their children must also "make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions" that required their children to be removed from custody. *Id.* at 519.

The Permanency Hearing Order from March 1, 2011, stated that DCS was making reasonable efforts to assist Mother in achieving the goals of the permanency plan by providing Mother with the following services: Parenting classes/counseling, individual counseling, and therapeutic visitation.[15] Ms. Policicchio testified that DCS provided Mother with over $16,000 in services during the time that the children had been in DCS custody including: a parenting assessment, two psychological assessments, a sixteen-week parenting class, personalized parenting and employment counseling from January to December 2010, individual counseling from October to December 2010, and individual counseling from February to September 2011. Further, DCS arranged visitations for Mother and the children, and provided therapeutic visitation beginning in July 2011. Ms. Policicchio testified that, while Mother did not receive counseling from a licensed psychologist, it was Ms. Policicchio's understanding that the counselors were supervised by a licensed psychologist. Ms. Policicchio also testified that, after she witnessed Mother's manipulation of counselors, she requested that Mother receive counseling from a licensed psychologist; however, the new counselor was not licensed.

Mother's initial psychological evaluation, conducted on January 28, 2010, indicated that she suffered from a generalized anxiety disorder and stated that Mother would benefit from a mentor to assist her in learning to make better decisions, individual counseling, drug

---

[14] "'Reasonable efforts' means the exercise of reasonable care and diligence by [DCS] to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). The court considers these factors:

> (1) the reasons for separating the parent from his or her children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the removal of the children, (5) the resources available to [DCS], (6) the duration and extent of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and [DCS'] efforts.

*In re Giorgianna H.*, 205 S.W.3d at 519.

[15] The orders approving the June 2009 and February 2010 permanency plans were in a different format from the 2011 order and do not specifically state that DCS was making reasonable efforts.

and alcohol assessment, job search assistance, and a mother's support group or parenting classes; these were included in the services about which Ms. Policicchio testified. A second assessment was conducted by Dr. Janice Berryman,[16] a licensed psychologist, in July 2011; Dr. Berryman diagnosed Mother with a personality disorder and found that Mother was "over-confident in her ability and her function at the current time," "has not been forthcoming in some of her therapeutic involvements with treatment professionals," and has "limited insight" in recognizing that "her behavior and lifestyle has not been productive for her children." Dr. Berryman recommended individual counseling by someone with "some experience and training"[17] and therapeutic visitation with the children.

Dr. Berryman and Ms. Policicchio, along with Mother's individual counselors, Ms. Hockaday and Mr. Kearney, all testified that, despite Mother's level of intelligence and education, she continually made poor decisions. The counseling and services provided to Mother attempted to address Mother's decision-making ability, but Mother failed to communicate honestly with service providers in order for them to provide the needed assistance. Mother possibly could have benefitted from additional therapy based on her diagnosis by Dr. Berryman, but, as noted by Dr. Berryman, Mother's own deception prevented an accurate diagnosis at the first evaluation. Further, Mother made no independent effort to obtain mental health services or counseling.

The trial court held that "[Mother] has failed to effect a lasting adjustment after reasonable efforts by available social service agencies." In this regard, the court found that "everything requested by [Mother] has been provided to her except for bus passes" and that while some services, such as therapeutic visitation, were delayed, the services were eventually provided to Mother, but that Mother's "lack of truthfulness made said services less than effective." The court also found that Alex Hockaday, one of Mother's counselors, made "admirable efforts" to assist Mother, but that Mother was not truthful with her.

---

[16] Although not in the record on appeal, it appears that Mother filed a motion in the termination proceeding to be evaluated by a mental health professional; the court granted the motion and appointed Dr. Berryman to perform the evaluation.

[17] Dr. Berryman's testified as follows:

> Q. The therapist that treats [Mother], what kind of, I'll say, credentials would they need to have?
> A. At least a Master's degree with some experience. And, generally speaking - - I mean, most mental health professionals at least have a master's degree and I don't think - - to me it really doesn't matter whether it's a social worker or a psychological person or LPC. It just needs to be someone with some experience and training.

The record shows that the services provided by DCS were extensive and appropriate. Although therapeutic visitation was not provided until July 2011, DCS provided eighteen such sessions by the time of trial. Further, the fact that Mother's counselors did not hold Master's degrees does not necessitate a finding that DCS failed to make reasonable efforts in this case; Mother's mental health issues were part of a much larger range of issues which led to the removal of the children and which were addressed in the permanency plans and in the services provided by DCS.

We affirm the trial court's termination of Mother's parental rights on the ground of substantial noncompliance with the provisions of the permanency plan.

## D.    Persistence of Conditions

Parental rights may be terminated on the basis of "persistence of conditions" as defined by Tenn. Code Ann. § 36-1-113(g)(3)(A) when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

The court made extensive findings of fact in determining that the conditions that led to the children's removal persisted; upon due consideration, we determine that the courts findings are supported by clear and convincing evidence.

The children entered DCS custody in May 2009 due to Mother's failure to provide a stable home; this was caused by Mother's legal troubles and choice of inappropriate caregivers for the children. The evidence clearly shows that, through the time of trial,

Mother continued to engage in behavior that put her at risk. While Mother has made gains in employment and in providing a physical home, the evidence does not show that she has demonstrated improved decision-making, such as to support long-term stability.[18] The record shows that Mother has been dishonest with service providers which has impeded improvement in Mother's decision-making ability. Despite the resources provided by DCS catalogued above, the entire evidence shows that the conditions that necessitated the children's removal continue and are unlikely to be improved.

Clear and convincing evidence also shows that the children would be disadvantaged by a continuation of the parent–child relationship. The evidence shows that the children love their Mother, who has continued regular visitation with the children; the continued passage of time, however, threatens the children's likelihood of integration into a permanent home. The children's foster mother, therapist, and caseworker each testified to the improvements the children have made in their current home and to the "emotional roller coaster" that Mother's instability has imposed on the children. The court found that Mother was likely to continue her practice of "farming out her children" to others to raise, a finding which is supported by the evidence.

Accordingly, we conclude that clear and convincing evidence supports the court's termination of Mother's parental rights on the ground of persistence of conditions.

## E.     Best Interests of the Children

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. The legislature has set out a list of factors at Tenn. Code Ann. § 36-1-113(i) for the courts to follow in determining the child's best interest.[19] The list of factors in the statute is not

_____

[18] For instance, Mother testified that her driver's license has been suspended since 2007 but that she has not addressed her outstanding fines and continues to drive unlicensed, that her car is not registered, and that she is not insured.

[19] The factors at Tenn. Code Ann. § 36-1-113(i) are:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment

(continued...)

exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest. *See In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dep't of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

The court made the following findings with respect to the children's best interest: Mother's continued poor life choices demonstrate that she has not made an adjustment in her conduct as to make it in the children's best interest to be in her home; despite DCS's reasonable efforts, Mother has failed to make lasting adjustment such that it no longer appears that a lasting adjustment is possible; Mother has refused to "take responsibility for any of her problems"; Mother "does not see the world as other do, and that [she] will continue to make the same mistakes over and over again"; neither parent has served as the children's primary caretaker; Mother has "failed to demonstrate that she understands or cherishes [the] relationship with her children"; Mother has continued regular visitation with the children, but no longer calls to speak to them on the phone; a change in the children's caretaker would pose a "great risk" to the "fragile nature" of the children's emotional health; and while Mother's home was physically appropriate, it could not be considered stable, given Mother's repeated arrests and incarcerations over the past year.

---

(...continued)

does not reasonably appear possible;

(3)  Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)  Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)  The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)  Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances, or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Each of the court's findings is supported by the record. The children's foster mother testified regarding the great gains the children have made while in her home including that they have become happier since residing in her home, have learned how to better care for themselves, and have developed a great affection for their new family. Further, the foster mother testified to the emotional disappointments suffered by the children when Mother failed to follow-through on promises to them. The children's therapist, likewise, testified to the "emotional roller coaster" that Mother's continuing instability caused for the children.

Despite DCS's efforts to assist Mother over the course of several years, Mother continually refused to acknowledge her responsibility in the children's removal, and, likewise, refused to accept responsibility for the detrimental effect her conduct and instability has had on the children. Due to this lack of acceptance, Mother has made little effort to change the behaviors which led to the children's removal. Although Mother and the children have continued to have a meaningful relationship while the children have been in DCS custody, the children have thrived in foster care; various witnesses testified that a change in caretakers would be detrimental to the children's emotional and mental well-being, especially given Mother's continued instability. Clear and convincing evidence supports the finding that termination of Mother's rights is in the children's best interest.

### IV. Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
RICHARD H. DINKINS, JUDGE